**SOMMERS SCHWARTZ, P.C.**
Trent R. Kashima, Esq. (SBN 291405)
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone: 248-355-0300
Facsimile: 248-746-4001
Email: tkashima@sommerspc.com

**SOMMERS SCHWARTZ, P.C.**
Kevin J. Stoops (*pro hac vice* forthcoming)
Charles R. Ash, IV (*pro hac vice* forthcoming)
One Towne Square, 17th Floor
Southfield, Michigan 48076
Telephone: 248-355-0300
Facsimile: 248-746-4001
Email: kstoops@sommerspc.com
Email: crash@sommerspc.com

*Attorneys for Plaintiff and Proposed Collective*
*and Class members*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH COY**,** individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>    vs.<br><br>LILITH GAMES (SHANGHAI) CO., LTD., and SHANGHAI LILITH NETWORK TECHNOLOGY CO., LTD.<br><br>             Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATION OF CAL. CIV. CODE §§ 1750,** *et seq.***;**<br>2. **VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200,** *et seq.***;**<br>3. **VIOLATION OF CAL. BUS. & PROF. CODE §§ 17500,** *et seq.***; and**<br>4. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL** |

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keith Coy ("Plaintiff"), on behalf of himself and all others similarly situated, files this class action (the "Complaint") against Lilith Games (Shanghai) Co., Ltd. and Shanghai Lilith Network Technology Co., Ltd. (collectively referred to herein as "Defendant" or "Lilith"), and alleges as follows:

## INTRODUCTION

1.    Defendant is a mobile videogame developer and service provider, based in Shanghai, China that markets its games and services throughout the United States.  Defendant's mobile games are marketed to consumers in the United States via the iTunes app store and Google Play.  This lawsuit arises from a mobile game developed and marketed in the United States by Defendant called Rise of Kingdoms ("ROK"), which Defendant describes as a real time strategy based game.

2.    Defendant's ROK is free to download and play, but solicits in-game purchases (micro-transactions) from players once they begin playing the game.  Defendant derives extraordinary income from these micro-transactions, in the range of tens of millions of dollars during the class period.

3.    The new trend in gaming is to depart from the pay-for-game model, wherein a player pays a one-time fee for a game and all of its features, by instead offering the underlying game for free to lure players into engaging in in-game micro-transactions.  This game model creates a stream of recurring revenue for the game developer.  On the other side of the relationship, the player's game account becomes a form of financial investment in which money periodically deposited for various in-game upgrades.

4.    As discussed herein, Defendant has perfected a predatory scheme whereby Defendant exploits players, including minors, by inducing them to make in-game purchases using deceptive and misleading representations.  The deceptive and misleading nature of Defendant's in-game solicitations are compounded because is no guarantee of actually receiving the item solicited by Defendant.  In fact, the probability of receiving the solicited item is deceptively low, which ultimately results in a form of unlawful, unregistered, and unmonitored gambling in Defendant's micro-transaction business model.

5.    Even worse, as oppose to a truly random outcome, Defendant manipulates or fixes the

outcomes of the various games of chance in ROK to maximize profit. This type of behavior is strictly prohibited by California gambling laws under the penal code. Consequently, as discussed herein, Defendant is engaged in unfair and unlawful business practices as defined by the California Business and Professions Code.

6.     To further exacerbate the unlawful business practices, Defendant takes no legitimate measure to prevent some forms of in-game cheating, when they could easily do so, because some forms of cheating results in additional revenue to Defendant. More specifically, players invest in Defendant's ROK game service with the understanding all players will be required to comply with the pre-established rules of the game, set forth by Defendant in their terms of service ("TOS"). However, rather than hold players accountable for violations of the TOS, Defendant is complicit in some forms of cheating such as account sharing (discussed below) because it generates additional revenue; unfortunately, at the expense of other non-cheating players.

7.     In these situations, rather than sanction the cheating player and reimburse the non-cheating player for financial losses incurred, Defendant attempts to capitalize on the cheating by marketing in-game items to the non-cheating player to restore them to their previous position in the game.

8.     As a direct and proximate result of Defendant's deceptive and unlawful business practices, Defendant has unjustly received millions of dollars from players who play ROK in United States.

9.     Plaintiff, individually and on behalf of all others similarly situated, seeks to recover for deceptive and otherwise unlawful in-game purchases solicited by Defendant under: (1) the California Consumer Remedies Act, Cal. Civ. Code § 1750, *et seq.*, (2) California Business and Professions Code, Unfair or Unlawful Business Practices, Cal. Bus. & Prof. Code, § 17200, *et seq.*; (3) California Business and Professions Code, Unfair or Unlawful Contest or Sweepstakes, Cal. Bus. & Prof. Code, § 17539.1, *et seq.* (4) California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and (5) Breach of the Covenant of Good Faith and Fair Dealing.

### **JURISDICTION**

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§

1332, and 1367.

11.    This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a class action in which: (1) there are 100 or more members in the proposed classes; (2) at least some members of the proposed classes have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

**VENUE**

12.    Venue is proper in the Northern District of California because a substantial portion of the events forming the basis of this suit occurred in the Northern District of California.

13.    Additionally, Defendant's TOS provide "any action with respect to the subject matter of these Terms will be the state and federal courts located in San Francisco, California, and each of the parties hereto waives any objection to jurisdiction and venue in such courts." *Exhibit 1*, TOS at p. 9.

**INTRADISTRICT ASSIGNMENT**

14.    A substantial part of the events or omissions which give rise to the claims occurred in San Francisco County, and therefore this action is properly assigned to the San Francisco Division. N.D. Cal. Local Rule 3-2(c).

**PARTIES AND PERSONAL JURISDICTION**

15.    Plaintiff Keith Coy is an individual currently residing in Connecticut.  Plaintiff downloaded ROK on his i-phone via the Apple iTunes app store.

16.    Lilith Games (Shanghai) Co., Ltd. is a Chinese corporation marketing mobile video game products and services (including ROK) in California and across the United States.  Upon information and belief, Defendants headquarters and principle place of business is located at Room 2055, Building 15, No. 500, South Shengxin Road, Jiading District, Shanghai, China.

17.    Shanghai Lilith Network Technology Co., Ltd. is also a Chinese corporation marketing mobile video game products and services in California and across the United States.  Upon information and belief, Defendants headquarters and principle place of business is located at Room 2166, Block A, Second Floor, Building 7, No. 88, Chenxiang Road, Jiading District, Shanghai,

3

1    China.

2        18.    Defendants have consented to personal jurisdiction in the Northern District of

3    California by filing a lawsuit in that District titled *Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc. et*

4    *al.*, Case No. 3:15-cv-01267-SC, and by virtue of their TOS, which call for all disputes to be heard

5    in this Court and decided under California law.

6        19.    Furthermore, this Court has personal jurisdiction over the Defendant because

7    Defendant conducts regular and systematic business activities in California.  Defendant has also

8    purposefully availed itself of the privileges of conducting activities in the state of California and

9    established minimum contacts sufficient to confer jurisdiction over Defendant, and the assumption

10   of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice

11   and is consistent with the Constitutional requirements of due process.

## GENERAL ALLEGATIONS

13       *A.*    ***The Micro Transaction Business Model and Loot Boxes***

14       20.    According to Juniper Research (a specialist provider of high quality business and

15   market intelligence to the financial, media and technology sectors) the video game micro transaction

16   industry is expected to swell to a $50 billion dollar industry by 2022.[1]

17       21.    Loot boxes are in-game packs available for purchase by players, which contain a

18   random selection of items.  Much of the allure of loot boxes comes from the fact that players don't

19   actually know what they'll receive before they "open" the box or "spin" the wheel.  Loot boxes

20   mostly contain common items, however, on a very low percentage of occasions will contain rare and

21   valuable in-game digital goods.  Much like a slot machine or a lottery, loot boxes require no player

22   skill, have randomly determined outcomes, and in this instance, undisclosed, abysmal odds.

23       22.    Defendant utilizes loot boxes in ROK to generate substantial amounts of revenue.

24   Specifically, the players of ROK are asked to exchange real world money for "gems," a form of in-

25   game virtual currency.  The gems purchased by players are then used to spin a roulette style wheel,

---

[1] *See*, https://www.juniperresearch.com/press/press-releases/loot-boxes-and-skins-gambling
(last visited on 12/9/2019).

roll dice, play a matching style game with cards, or to open a chest with undisclosed items.[2]

23. Unfortunately for players of ROK, the loot boxes are plagued with deception, misrepresentation, and exploitation.

24. The deception is largely caused by the informational discrepancy between Defendant's game developers and the players. While the odds of receiving *some* prizes in ROK's loot box system are disclosed, in most aspects of their loot box based game model, the players, many of whom are minors, are provided with no information whatsoever regarding the odds of winning a particular prize.

25. Even more problematic with Defendant's loot box based game model are the situations in which players are intentionally misled by Defendant regarding the odds of winning the desired prize.

26. An example of a Defendant's intentional deception of players, such as Plaintiff, is the Wheel of Fortune loot box (depicted below). The Wheel of Fortune loot box operates similar to a roulette wheel: (1) players use real money to purchase gems; (2) players use the gems to spin a wheel, which provides the opportunity to land on one of twelve prizes; and (3) the player wins the prize they land on. Most of the prizes on the wheel are common items; however, the most valuable prize on the wheel provides eight sculptures of a legendary commander.



28. Notwithstanding the fact that many of the players of ROK are minors, even an adult

---

[2] For purposes of this complaint, the term "loot box" refers to all of Defendant's various games of chance within ROK that utilize gems as currency to win prizes.

would reason they have a one in twelve chance of landing on the best prize while spinning the Wheel of Fortune in ROK.  However, this is not the case.  In actuality, the odds of winning the best prize on the Wheel of Fortune are miniscule.

29.    Furthermore, Defendant's "Wheel of Fortune" game in ROK does not comply with Apple's terms and conditions pertaining to in-game sales.  Apple now requires game developers to disclose the odds of receiving items in loot boxes for all games sold in its App Store.  In an effort to promote transparency and protect consumers, in December 2017, Apple added guidelines to its App Store making the disclosure of loot boxes mandatory.  Under Apple's new rule, "Apps offering 'loot boxes' or other mechanisms that provide randomized virtual items for purchase must disclose the odds of receiving each type of item to customers prior to purchase."[3]

30.    Another example of Defendant's deceptive loot box driven game model is the "Garden of Infinity" dice game (depicted below).  In this game, players throw dice, then move forward a number of spaces based on the roll of the dice and receive corresponding rewards or trigger special events.  Players can use gems to purchase dice rolls.  Similar to Defendant's other loot box games in ROK, the "Garden of Infinity" dice game requires no skill and the odds of winning the various prizes are not disclosed to players.



---

[3] Ben Kuchera, *Apple adds new rules for loot boxes, requires disclosure of probabilities*, polygon.com (Dec. 21, 2017, 9:44 AM), https://www.polygon.com/2017/12/21/16805392/loot-box-odds-rules-apple-app-store (last visited on 12/10/19).

31.     Defendant's ROK "League Bets" (depicted below) even allows players to gamble in-game virtual items on the outcomes of battles between other players in the game.



32.     In the "Eye for Talent" event, ROK players are allotted a certain number of picks to bet on the outcome of battles between alliances.  However, the players can obtain additional picks by purchasing a "Bettors Bundle" (depicted below).



33.     As further discussed herein, Defendant's loot box driven game model constitutes a scheme for the disposal or distribution of property by chance, among persons who have paid valuable consideration for the chance of obtaining such property or a portion of it.  *See*, Cal. Penal Code § 319.

34.     In other words, Defendant is operating an illegal and unregulated gambling enterprise in its mobile videogame.

B.      ***In-Game Currency and Items Constitute "Things of Value"***

35.     Players in ROK can obtain gems in a few different ways.  A small amount of gems can be acquired through the completion-to of in-game activities.  However, earning gems for free-to-

play players of the game is a very slow process, which yields relatively few gems. On the other hand, Defendant constantly solicits the purchase of gems through in-game advertisements for "value bundles" or for purchase in the "Gem Store."

36.     Bundles offer the players in-game resources, speed ups, and gems. Bundles can be purchased at any time for $0.99, $4.99, $9.99, $19.99, $49.99, or $99.99.



provides them with an advantage over other players who are free-to-play or spend less on in-game purchases.

38.     Alternatively, a player may simply purchase gems at any time from the Gem Store. In the Gem Store, gems can be purchased at the following prices: 200 gems for $0.99; 1,050 gems for $4.99; 2,200 gems for $9.99; 4,600 gems for $49.99; or 25,000 gems for $99.99.



39.    ROK was unquestionably developed by Defendant as a "pay-to-win" game. In other words, Defendant developed the game to effectively limit a player's ability to progress within the game without spending money, and on the other hand, reward those players who spend money.

40.    The pay-to-win game model, driven by the combination gem sales and games of chance, provides Defendant with a source of recurring revenue from players.

41.    Plaintiff estimates he has spent over $8,000.00 purchasing bundles and gems from Defendant.

42.    Because the items provided through Defendant's electronic gambling scheme are needed to advance within the game and compete with other players, these items have intrinsic value. Indeed, the items acquired in the game even have resale value *via* third party websites. For example, the website www.playerup.com allows players to sell developed ROK accounts for extraordinary sums of money. As illustrated in the exhibit attached hereto, one account is listed for $10,000.00. *Exhibit 2*, Third Party Sales of ROK Accounts.[4]

43.    In relation to state gambling laws, the California Penal Code defines a "thing of value" as "any money, coin, currency, check, chip, allowance, token, credit, merchandise, property, or any representative value." *See*, Cal. Penal Code § 330.2.

44.    The gems and other in-game virtual items used as virtual currency in Defendant's ROK game constitute a "thing of value" under the California Penal Code.

C.    ***Defendant's Exploitation of Consumers***

45.    The combination of converting real world money into gems, as a form of in-game currency, along with Defendant's loot-box driven game model, results in the perfect predatory scheme in which the true long-term cost of playing ROK is hidden from the player.

46.    Defendant allows players to download and start the game for free. Defendant even provides players with a small allocation of gems to get them hooked into the game. However, once the player becomes psychologically committed to the game, Defendant subjects the players to

---

[4] As discussed below, account sharing is cheating and technically prohibited by Defendant's TOS. However, in actuality, Defendant makes no real effort to stop it from occurring because it generates more money for Defendant.

1    unavoidable solicitations to get them financially committed.

2         47.    The unavoidable solicitations and systems used by Defendant manipulate reward

3    outcomes to reinforce purchasing behaviors.

4         48.    For example, if a player unlocks a "Legendary Commander" in one of Defendant's

5    loot box games, as Plaintiff has done many times, they are immediately subjected to an advertisement

6    that occupies the entire screen and prompts the player to purchase a "Writer of History" bundle to

7    upgrade the commander for $4.99.  In other words, the loot box driven game model drives players to

8    spend for the chance to win, then when they do win, they are encouraged to double down on their

9    winnings with unavoidable solicitations.

10        49.    Defendants manipulate the in-game systems based on a player's activities to trigger a

11   cascade of advertisements to keep the financial investments pouring in.

12        50.    The targeted advertisements of ROK also manifest themselves in a number of other

13   ways, for example, if a player upgrades their city hall to level 23, as was the case with Plaintiff, they

14   are prompted to purchase a "One Step Ahead" bundle for $74.99 with an advertisement that occupies

15   the entire screen.  This bundle allows the player to use speed ups to further advance their

16   development, until they reach the next level, where they will receive more solicitations for additional

17   bundle purchases.

18        51.    Hawaii State Legislator Chris Lee recently wrote on Reddit, "loot boxes and micro

19   transactions are explicitly designed to prey upon and exploit human psychology in the same way

20   casino games are so designed."[5]

21        52.    Once entrapped, players often spend escalating amounts of money to protect their

22   investment believing they have invested too much to quit.  In this way, players experience the sunk

23   costs effect by which they may justify further purchases.

24        53.    This exploitation is furthered by leveraging the knowledge of a player's game related

25   situations, preferences, available funds, and spending habits to tailor offers to that player to maximize

26

27   _____

         [5] *See*, https://www.polygon.com/2017/12/21/16805392/loot-box-odds-rules-apple-app-store
28   (last visited 12/10/19).

the likelihood of a purchase.

54.     ROK is a real-time strategy game that allows players to build armies and cities. One player can attack another to loot the resources (food, wood, stone, and gold) the player has stored in his or her city.  On many occasions, Plaintiff has been attacked by other players.  This is part of the game.  However, whenever Plaintiff found himself on the losing end of a battle, he received an unavoidable solicitation that occupied the entire screen and prompted him to by a "Fate Changer" bundle.  The bundles ranged anywhere from $4.99 to $99.99, depending on the severity of losses Plaintiff incurred.

55.     Nearly every aspect of Defendant's game is designed to lure additional financial investment from its players.

56.     Furthermore, because players are converting real money into gems, it becomes difficult to conceptualize the amount of money that is actually being spent.

57.     Nonetheless, by virtue of Defendant's loot box driven game model, a player's ROK account becomes a financial investment, which players become desperate to protect.

### D.     Defendant Capitalizes on In-Game Cheating (Account Sharing)

58.     The act of account sharing in ROK is self-explanatory. In short, two or more players agree to create a shared ROK account.

59.     Account sharing is not uncommon in ROK and the practice confers substantial benefits to players who share accounts, under Defendant's pay-to-win game model.  More specifically, the players who pool their money together are capable of creating extraordinarily powerful ROK accounts.  These shared accounts allow the players to loot (steal) in-game resources from individual players with relative ease.

60.     Unfortunately, as discussed above, a player who is looted by a shared account stands to incur substantial financial losses because many of the in-game resources looted from their city were purchased using gems (obtained with real world money) or outright purchased with cash in bundles.

61.     Alternatively, a player stands to lose some of the in-game items won after paying to play Defendant's loot box games.  For example, in the Wheel of Fortune game, one of the more

common items to win are: food, wood, stone, or gold.  If a player spends 3,600 gems to spin the wheel five times and receives resources on each spin, then the player has just spent approximately $15.00 of real world money to acquire the resources.  The resources won by the player spinning the wheel can then be looted by another player, if the attacking player can defeat the defending players' defenses.

62.    Not only does a shared account possess substantially more spending power than an individual account, a shared account has a significant tactical advantage over an individual account because the shared account can reduce, or even eliminate, down time.  Down time is time in which a player is offline.  As stated above, ROK is a real time strategy game, which means the game continues 24 hours a day, seven days a week, regardless of whether a player is online and actively playing.  Realistically, an individual player needs to go offline to sleep or go to work.  However, a shared account can simply be passed from one player to the next effectively reducing or eliminating any down time.

63.    With all of this in mind, creating a shared account would appear to be an efficient way to succeed in ROK – and indeed it is.  However, the problem is that account sharing is expressly prohibited by the ROK terms of service.  ***Exhibit 1***, Lilith Terms of Service.

64.    Defendants Terms of Service Provide the following:

- Lilith reserves the right to suspend or terminate your Lilith Account if any information provided during the registration process or thereafter proves to be inaccurate, not current or incomplete.

- You are responsible for safeguarding your password. ***You agree not to disclose your password to any third part or to allow any third party to use your Lilith Account.***

- ***You agree not to do any of the following while using our Services, Lilith Content, or User Content … Solicit Member login credentials from another Member … Create an Lilith Account for anyone other than yourself … Account sharing, including but not limited to the sharing of username and password for others to login for you.***

- Lilith reserves the right, at any time and without prior notice, to remove or disable

access to any User Content that Lilith, in its sole discretion, considers to be in violation of these Terms or otherwise harmful to our Services.

- Lilith may at any time suspend or terminate your Lilith Account and refuse to provide access to our Services if Lilith suspects or determines, in its own discretion, that you may have or there is a significant risk that you have: (i) failed to comply with any provision of these Terms or any policies or Rules established by Lilith; (ii) engaged in actions relating to or in the course of using our Services that may be illegal or cause liability, harm, embarrassment, harassment, abuse or disruption for you, Lilith Users, Lilith or any other third parties or our Services.

- These Terms and any action related thereto will be governed by the laws of the State of California without regard to its conflict of laws provisions.  The exclusive jurisdiction and venue of any action with respect to the subject matter of these Terms will be the state and federal courts located in San Francisco, California, and each of the parties hereto waives any objection to jurisdiction and venue in such courts.

- Subject to the foregoing, these Terms will bind and inure to the benefit of the parties, their successors and permitted assigns.

*Exhibit 1.*

65.     As stated above, to date, Plaintiff has invested over $8,000.00 in his ROK account. On or about September 2, 2019, Plaintiff was attacked by a shared account (user identification 27819749) on server 1412 and, as a result, sustained significant financial losses.

66.     Additionally, hundreds of other players on server 1412 were attacked by the same shared account and also sustained significant financial losses.[6]

67.     To date, Defendant has not compensated Plaintiff (or any other player) for any of the financial losses incurred as a result of the shared account who cheated and stole their resources.

68.     Instead of reimbursing the players for their financial losses, Defendant capitalized on

---

[6] To put account power rankings into perspective, Plaintiff, who at the time had invested approximately $7,000 in his ROK account had a power ranking of 25,000,000.  The shared account that looted Plaintiff and hundreds of other players on the server had a power rating of 120,000,000 – nearly five times higher than Plaintiff.  The account was essentially unstoppable.

the players' losses by soliciting them "Fate Changer" bundles, which restored lost resources and allowed them to train new troops that were either killed or injured (hospitalized) in the attacks.

69.    For days, Plaintiff and other players complained to Defendant's customer support regarding the cheating that was occurring in Kingdom 1412.  Plaintiff even provided customer support will screenshots which illustrated the cheating players bragging about sharing the account. Sadly, Defendant took no action to stop the cheating.  For days on end, players had their cities looted by the shared account, until finally, they were forced to purchase "passports" from Defendant, which allowed them to leave server 1412 and "migrate" to another server.

70.    Defendant wrongfully obtained significant profits directly from the cheating activities that occurred in kingdom 1412.

71.    Defendant has the data necessary to identify and stop account sharing, but refuses to do so.

72.    According to Defendant's privacy policy, Defendant automatically collects each players IP address and device information (such as application version, network type, OS (operating system)) and information regarding players' use of the game, such as date and time stamps of actions. Defendant also collects demographic data (such as to determine the coarse location of the players' IP address).  *See Exhibit 3*, Defendant's Privacy Policy.

73.    Defendant is aware their game is plagued with this type of cheating, but takes no action to correct it because they profit from it (at the expense of non-cheating players).  One player wrote the following post in a ROK forum on Defendant's website:

> I am currently playing on a kingdom where around 3-5 players are buying external resources like crazy.  We see them all the time surrounded by those bot cities hitting them only for them to port out after and new ones port in.  All Chinese names matching those 99% of the bots, all city hall 5, we even matched some of their names with spam mails we got from them offering us resources … Reporting them directly to the customer service with all kinds of screenshots and even chats with them where they admit breaking the ToS get waved away like "if we were aware they are breaking the ToS they would've already been banned."

> Also, the player who does it mainly openly admitted to share accounts with a buddy to be online 24/7.  This does not only create an extremely unfair advantage for MG, it's even stated in the ToS it is forbidden.  Seeing people winning because they can whip out their credit card is one thing, but people "cheating" to get an even bigger advantage is another level of unfair.

1     *Exhibit 4*, Exemplary Account Sharing Complaint.

2        74.     Account sharing is rampant in Defendant's ROK game and results in substantial

3 financial losses to the players who play fairly and comply with Defendant's TOS.

4                                   **CLASS ACTION ALLEGATIONS**

5        75.     Plaintiff brings this action pursuant to Fed R. Civ. P. 23(b)(2) and (b)(3) on their own

6 behalf and on behalf of:

7                All current and former players of Rise of Kingdoms who made in-game
               purchases in the United States at any time within four years of the filing of

8                this Complaint to the date of class certification.

9 (the "Class").  Plaintiff reserves the right to amend this definition as necessary.

10        76.     The members of the Class are so numerous that joinder of all Class members in this

11 case would be impractical.  Plaintiff reasonably estimates there are, at least, tens of thousands of

12 Class members. Class members should be easy to identify from Defendant's computer systems and

13 electronic records.  Additionally, class members can easily be identified by third-party payment

14 processors used by Defendant in conducting their microtransactions.

15        77.     Commonality.   There is a well-defined community of interest among Rule 23

16 Nationwide members and common questions of law and fact predominate in this action over any

17 questions affecting individual members of the Class.  These common legal and factual questions,

18 include, but are not limited to, the following:

19            a.    Whether Defendant made deceptive representations to solicit micro-transactions from

20                the Class in ROK, and whether those deceptive representations violate the California

21                Consumer Remedies Act;

22            b.    Whether Defendant misrepresented the characteristics, uses, or benefits of their

23                videogame products and services to solicit micro-transactions from the Class in ROK,

24                and whether those misrepresentations violate the California Consumer Legal

25                Remedies Act;

26            c.    Whether Defendant misrepresented the style or model of their videogame products

27                and services (*e.g.* account sharing) to solicit micro-transactions from the Class in

28                ROK, and whether those misrepresentations violate the California Consumer

Remedies Act;

d.  Whether Defendant advertised their videogame services to the Class with the intent not to sell them as advertised, in violation of the California Consumer Legal Remedies Act;

e.  Whether Defendant represented their videogame services to the Class to involve obligations that it did not have or involve, in violation of the California Consumer Legal Remedies Act;

f.  Whether Defendant inserted an unconscionable provision in a contract (TOS) with the Class, in violation of the California Consumer Legal Remedies Act;

g.  Whether the Defendant engaged in unfair or unlawful business practices in their methods of soliciting in-game micro-transactions from the Class;

h.  Whether Defendant engaged in unfair or unlawful business practices in allowing certain players of ROK to cheat by creating and utilizing shared accounts in the game;

i.  Whether Defendant's loot box driven game model amounts to an unfair contest or sweepstakes, in violation of the California Business Professions Code;

j.  Whether any part of Defendant's solicitations to the Class were untrue or misleading, in violation of California's False Advertising Act; and

k.  Whether Defendant's loot box driven game model, the corresponding solicitations, and Defendant's complacency in cheating was a breach of the covenant of good faith and fair dealing.

78.  <u>Numerosity</u>.  Plaintiff estimates the size of the Class to be in excess of a thousand individuals.  This size makes bringing the claims of each individual member of the class before this Court impracticable.  Likewise, joining each individual member of the Class as a plaintiff in this action is impracticable.   The identity of the members of the Class will be determined from Defendant's records or the records of third-party vendors that process payments for Defendant.  As such, a class action is a reasonable and practical means of resolving these claims.

79.  <u>Typicality</u>.  Plaintiff's claims are typical of those of the Class in that they and all other Class members suffered damages as a direct and proximate result of the Defendant's common and

systemic policies and practices.  Plaintiff's claims arise from the same advertisements, policies, practices, promises, and course of conduct as all other Class members' claims and his legal theories are based on the same legal theories as all other Class members.

80.     Adequacy. Plaintiff will fully and adequately protect the interests of the Class and have retained counsel who are qualified and experienced in the prosecution of nationwide class actions.  Neither Plaintiff nor their counsel have interests that are contrary to, or conflicting with, the interests of the Class.

81.     Superiority.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because, *inter alia*, it is economically infeasible for Class members to prosecute individual actions of their own given the amount of damages at stake for each individual.  Prosecution of this case as a class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

82.     Manageability.  This case will be manageable as a class action. Plaintiff and his counsel know of no unusual difficulties in this case and Defendant and their third-party payment vendors have advanced and networked computer systems that will allow the class damages issues in this case to be resolved with relative ease.  By concentrating this litigation in one forum, judicial economy and parity among the claims of individual Class members will be promoted.  Additionally, class treatment in this matter will provide for judicial consistency.

83.     Notice of the pendency and any resolution of this action can be provided to the Class by mail, electronic mail, text message, print, broadcast, internet and/or multimedia publication.  The identity of members of the Class is readily identifiable from Defendant and their third-party payment processors' records.

84.     Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

85.     Because Defendant acted and refused to act on grounds that apply generally to the Class and declaratory relief is appropriate in this case with respect to the Class as a whole, class

1  certification pursuant to Rule 23(b)(2) is also appropriate

2      86.    Ultimately, a class action is a superior form to resolve all of the claims detailed herein

3  because of the common nucleus of operative facts centered on Defendant's conduct towards Plaintiff

4  and the Class, including but not limited to, the Defendant's failure to provide the videogame products

5  and services as promised to Plaintiff and the Class.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**(California Civil Code §§ 1750, *et seq.*)**
**On Behalf of Plaintiff and the Class**

87.    Plaintiff incorporates all other paragraphs as though fully set forth herein.

88.    Pursuant to Cal. Civ. Code § 1784, Plaintiff sent Defendant notice of their intent to bring this lawsuit for violations of the California Consumer Legal Remedies Act ("CLRA") on or about September 12, 2019.  Defendant confirmed receipt of the notice letter and responded in writing on or about November 14, 2019.

89.    The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760.

90.    The CLRA prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer.  Cal. Civ. Code § 1760.

91.    Defendant violated the CLRA by engaging in unfair methods of competition and unfair or deceptive acts or practices in the soliciting financial investment from Plaintiff and the Class in their ROK game as set forth herein.

**Violation of Cal Civ. Code §1770(a)(4) – Deceptive Representations**

92.    Defendant used deceptive representations in connection with their goods or services, in violation of Cal Civ. Code §1770(a)(4).

93.    More specifically, Defendant violated Cal Civ. Code §1770(a)(4) because Defendant lead Plaintiff and all other players to believe they could invest real world money into their game services and all players would be bound to play the game within the rules established by Defendant,

including, but not limited to the rules set forth in Defendant's TOS.  Defendant's deceptive representations regarding the rules of the game and the enforcement of those rules on other players (or lack thereof) has caused Plaintiff and the Class to be deceived into purchasing services from Defendants, which are substantially different than what they bargained for.  Plaintiff and the Class would not have purchased Defendant's video game products and services (invested in their game) if they had known Defendant would be complicit in other players cheating, then capitalize on those activities.

94.     Additionally, Defendant violated Cal Civ. Code §1770(a)(4) failing to disclose the odds, misrepresenting the odds, or deceiving Plaintiff and the Class about the odds of receiving certain items in Defendant's ROK loot box games referenced herein.

95.     More specifically, by way of illustration not limitation, Defendant used deceptive representations to lure Plaintiff and the Class into making purchases in connection with its Wheel of Fortune game, in which Defendant presented players (including Plaintiff) with the opportunity to spin a wheel to win one of twelve prizes, but in actuality, the wheel was rigged to ensure the players did not have a one in twelve chance to win the most valuable items.  In concocting this intentionally deceptive loot box game, Defendant violated Cal Civ. Code §1770(a)(4).

96.     As a direct and proximate result of Defendant's deceptive business practices, Plaintiff and the Class sustained financial loss and damage.

**Violation of Cal Civ. Code §1770(a)(5) – Misrepresenting Characteristics, Uses, or Benefits**

97.     Defendants violated Cal Civ. Code §1770(a)(5) by representing that the virtual goods and videogame services they offered had characteristics, uses, and benefits that they did not.

98.     Defendants TOS state players use and access of their video game services are governed by the TOS and that the TOS are legally binding.

99.     The TOS also require that all players "agree not to do any of the following while using our services … [s]olicit member login credentials from another Member … [c]reate an Lilith Account for anyone other than yourself … [a]ccount sharing, including but not limited to the sharing of username and password for others to login for you."

100.     Based on Defendant's representations of the characteristics, uses, and benefits of their

videogame services, specifically that only individual accounts would be permitted as opposed to shared accounts, Plaintiff and the Class made financial investment in Defendant's videogame products and services.

101.    Additionally, Defendant misrepresented the true characteristics, uses, or benefits of many of their loot boxes games, including, but not limited to the Wheel of Fortune, which promises players the opportunity to spin a wheel with twelve possible outcomes, but then rigs or manipulates the wheel so the most desirable outcomes are rarely reached.

102.    As a direct and proximate result of Defendant's misrepresentations regarding the characteristics, uses, or benefits of their videogame products and services, Plaintiff and the Class sustained financial losses.

103.    Plaintiff and the Class would not have made financial investment in Defendant's videogame products and services had they known the true nature of the characteristics, uses, or benefits, such as the fact that Defendant would be complicit in cheating by allowing some players to engage in account sharing.

### Violation of Cal Civ. Code § 1770(a)(7) – Misrepresenting Services

104.    Defendant represented that their videogame goods or services were of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another, in violation of Cal Civ. Code §1770(a)(7).

105.    Similar to the deceptive practices and misrepresentations previously outlined, Defendant represented ROK as a game for individual accounts, not shared accounts.

106.    Based on this representation, Plaintiff and the Class invested in the game.

107.    Plaintiff and the Class would not have invested in the game if they had known that account sharing would be tolerated by Defendant and that Defendant would in fact attempt to capitalize and exploit individual players when this type of in-game cheating occurred.

108.    Additionally, Defendant misrepresented the style or model of many of their loot box games.  For example, Defendant's Wheel of Fortune game, which represents to players they can win one of twelve prizes by spinning the wheel; however, in reality, the chances of them winning the most desirable prizes are extremely low.

109.    Plaintiff and the Class would not have invested in Defendant's videogame products and services if they had known the true nature of style or model of those products and services.

110.    As a direct and proximate result of Defendants violation of Cal Civ. Code §1770(a)(7), Plaintiff and the Class sustained financial losses and damages.

### Violation of Cal Civ. Code §1770(a)(9) –
**Advertising goods or services with intent not to sell them as advertised**

111.    Defendant advertised their videogame products and services with the intent not to sell them as advertised, in violation of Cal Civ. Code §1770(a)(9).

112.    Defendant's TOS advertised ROK as a game to be played by individual accounts only, not shared accounts.  In reality, the game is played by both individual and shared accounts.

113.    Additionally, Defendant advertised their loot box games in methods that suggested certain odds of winning, when in fact, the odds of winning were much lower than advertised.  An example of this is Defendant's Wheel of Fortune game, which encourages players to pay money spin a wheel for a one in twelve chance to win a prize, but in reality Defendant intentionally manipulates the wheel, without any notice to the players, in order to lower the odds (substantially) of winning the more desirable prizes.

114.    Based on Defendant's advertisements, which were at best deceptive if not completely false, Plaintiff and the Class invested in Defendant's videogame products and services.

115.    Plaintiff and the Class would not have invested in Defendant's products and services if they had known Defendant's advertisements were false and the products and services they were investing in were different than they were advertised as by Defendant.

116.    As a direct and proximate result of Defendant's false advertisements, Plaintiff and the Class sustained financial losses and damages.

### Violation of Cal Civ. Code §1770(a)(14) –
**Representing a transaction involves obligations that it does not have or involve**

117.    In violation of Cal Civ. Code §1770(a)(14), Defendant represented to Plaintiff and the Class that playing and investing in Defendant's products and services placed obligations on them that in reality did not exist.

118.    Defendant's TOS represent that all players of ROK are obligated to abide by the TOS,

in particular the requirement not to share accounts.  However, in reality, and despite the massive amount of investment Defendant receives from ROK players, Defendant takes no legitimate action to ensure the TOS are enforced.

119.    Plaintiff and the Class would not have invested in Defendant's products and service had they known Defendant had no intention of enforcing the TOS to ensure a fair gaming environment.

120.    As a direct and proximate result of Defendant's failure to enforce the obligations contained in the TOS, Plaintiff and the Class sustained financial losses and damages.

## Violation of Cal Civ. Code §1770(a)(19) – Inserting an unconscionable provision in the contract

121.    Defendant's game is governed by a TOS agreement which is offered to consumers on a take-it-or-leave-it basis, without the opportunity to negotiate the terms of the contract.  Accordingly, Defendant's TOS agreement is a contract of adhesion.

122.    Defendant's TOS agreement is only provide to consumers after they download the game on to their mobile device, enter the setting menu, and select the "Terms of Service." Alternatively, Defendant's TOS agreement is available on its website.  These terms are not affirmatively presented to individuals before they download the game and start playing. These terms, therefore, are not reasonably available to consumers before the start the application and are procedurally unconscionable.

123.    Defendant's TOS agreement includes multiple unconscionable provisions, most notably their attempt to limit their liability to any player to one hundred U.S. dollars ($100), even for their intentional acts discussed herein.  Such a provision is not enforceable under California law.

124.    Cal. Civ. Code § 1668 provides "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of law."

125.    Similarly, Defendant's TOS agreement requires payment for purchase which violates California law, the law governing the contract.  The governing law is California law expressly

prohibits the specific loot-box style gambling within the game, but still Defendant requires consumers to pay for these illegal aspects of their services and Defendant's TOS agreement deny consumers the opportunity to seek a refund.

126.    Cal. Civ. Code § 1670.5 provides "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

127.    The limitation on liability and requirement to pay for illegal services, as contained in Defendant's TOS, is substantively unconscionable and unenforceable as to all of the allegations made in this complaint.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE UNFAIR COMPETITION LAW**
**Fraudulent, Unlawful, and Unfair Competition**
**(California Business and Professions Code §§ 17200, *et seq.*)**
**On Behalf of Plaintiff and the Class**

128.    Plaintiff incorporates all other paragraphs as though fully set forth herein.

129.    California Business & Professions Code § 17200 *et seq*. prohibits unfair competition in the form of any unlawful, unfair, deceptive, or fraudulent business practices.

130.    Plaintiff brings this cause of action individually and as a representative of all others subject to Defendant's unlawful acts and practices.

131.    As stated above, Defendant's gems and other virtual items in ROK constitute a "thing of value" under California gaming laws.  *See*, Cal. Penal Code § 330.2.

132.    Defendant's loot box system constitutes an illegal slot machine because it is a device which is "operated in such a way that, as a result of the insertion of any piece of money or coin or other object the machine or device is caused to operate or may be operated or played, mechanically, electronically, automatically or manually, and by reason of any element of hazard or chance, the user may receive or become entitled to receive anything of value." Cal. Penal Code § 330.1 (f).

133.    Every person who unlawfully manufactures, sells, or leases any slot machine shall be guilty of a misdemeanor and/or subject to fines.  Cal. Penal Code § 330.1 (a) – (f).

134.    "Every person who owns or operates any concession, and who fraudulently obtains money from another by means of any hidden mechanical device or obstruction with the intent to diminish the chance of any patron to win a prize, or by any other fraudulent means, shall be punished as in the case of theft of property of like value."[7] Cal. Penal Code § 334 (a).

135.    "Any person who manufactures or sells any mechanical device or obstruction for a concession which he knowns or reasonably should know will be fraudulently used to diminish the chance of any patron to win a prize is guilty of a misdemeanor." Cal. Penal Code § 334 (b).

136.    "Every person who by ... any game, device, slieght of hand, pretensions to fortune telling, trick or other means whatever, by use of cards or other implements or instruments, or while betting on sides or hands of any play or game, fraudulently obtains from another person money or property of any description, shall be punished as in the case of larceny of property of like value for the first offense."[8]  Cal. Penal Code § 332(a).

137.    "It is unlawful to cheat at any gambling game."  Cal. Penal Code § 337x.

138.    Furthermore, "[m]isrepresenting in any manner the odds of winning a prize" in a contest of sweepstakes is unlawful.  Cal. Bus. & Prof. Code § 17539.1 (a)(3).

139.    "Misrepresenting in any manner, the rules, terms, or conditions of participation in a contest is unlawful."  Cal. Bus. & Prof. Code § 17539.1(a)(4).

140.    "Failing to clearly and conspicuously disclose with all contest puzzles and games and with all promotional puzzles and games ... the maximum number of puzzles or games that may be necessary to complete the contest and determine winners; [t]he maximum amount of money … that a participant may be asked to pay to win each of the contest prizes then offered; … [and] [a]ll rules, regulations, terms, and conditions of the contest" is unlawful. Cal. Bus. & Prof. Code § 17539.1(a)(5).

141.    "Failing to clearly and conspicuously disclose the exact nature and approximate value

---

[7] "As used in this section, 'concession' means any game or concession open to the public and operated for profit in which a patron pays a fee for participating and may receive a price upon a later happening."  Cal. Penal Code § 334(d).

[8] "For the purposes of establishing the value of property under this section, poker chips, tokens, or markers have the monetary value assigned to them by the players in the game." Cal. Penal Code § 332(c).

1   of the prizes when offered" is unlawful.  Cal. Bus. & Prof. Code § 17539.1(a)(6).

2      142.    "Using or offering for use any method intended to be used by a person interacting

3 with an electronic video monitor to simulate gambling or play gambling-themed games in a business

4 establishment that (A) directly or indirectly implements the predetermination of sweepstakes cash,

5 cash-equivalent prizes, or other prizes of value, or (B) otherwise connects a sweepstakes player or

6 participant with sweepstakes cash, cash-equivalent prizes, or other prizes of value. For the purposes

7 of this paragraph, "business establishment" means a business that has any financial interest in the

8 conduct of the sweepstakes or the sale of the products or services being promoted by the sweepstakes

9 at its physical location.

10      143.    Defendant's ROK game and the loot box game model therein constitute an unlawful

11 contest or sweepstakes.

12      144.    Defendant's ROK game and the loot box game model therein have violated each of

13 the aforementioned provisions of the California Business & Professions Code.

14      145.    As a result of these unlawful and/or unfair and/or fraudulent business practices,

15 Defendant reaped unfair benefits and illegal profits at the expense of Plaintiff and the rest of the

16 Class.  Defendant must disgorge these ill-gotten gains and restore to Plaintiff and the Class for their

17 financial losses.

18      146.    During all relevant times, Defendant committed unlawful, unfair, and/or fraudulent

19 acts as defined by California Business & Professions Code § 17200.  Defendant's unlawful, unfair,

20 and/or fraudulent business practices include, without limitation, the deceptive practices and

21 procedures utilized in their unlawful loot box system (as discussed herein), which unquestionably

22 amounts to a form of unlawful gambling under California law.

23      147.    Defendant's unlawful, unfair, and/or fraudulent business practices also includes,

24 without limitation, Defendant's failure to prevent players from cheating, subsequent attempts to

25 capitalize on cheating, and further attempts exploit honest players effected by cheating when

26 Defendant should have, at a minimum, reimbursed players for the financial losses they incurred as a

27 result of the cheating.

28      148.    Defendant also misrepresents the odd of receive certain in game items through their

1    various loot box schemes.

2        149.    As a result of these unlawful and/or unfair and/or fraudulent business practices,

3    Defendant reaped unfair benefits and illegal profits at the expense of Plaintiff and the rest of the

4    Class.  Defendant must disgorge these ill-gotten gains and restore to Plaintiff and the Class for their

5    financial losses.

6        150.    Plaintiff individually and on behalf of the members of the Class, respectfully requests

7    that judgment be awarded to provide restitution and interest, and order enjoining Defendant from

8    further unlawful business practices, and the relief requested below in the Prayer for Relief.

9                            **THIRD CAUSE OF ACTION**
                    **VIOLATIONS OF THE FALSE ADVERTISING LAW**
10                    **(California Business and Professions Code § 17500)**
                        **On Behalf of Plaintiff and the Class**

11       151.    Plaintiff incorporates all other paragraphs as though fully set forth herein.

12       152.    California's False Advertising Law ("FAL") states: "[i]t is unlawful for any person,

13   firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose

14   of real or personal property or to perform services, professional or otherwise, or anything of any

15   nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or

16   disseminate or cause to be made or disseminated before the public in this state, or to make or

17   disseminate or cause to be made or disseminated from this state before the public in any state, in any

18   newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in

19   any other manner or means whatever, including over the Internet, any statement, concerning that real

20   or personal property or those services, professional or otherwise, or concerning any circumstance or

21   matter of fact connected with the proposed performance or disposition thereof, which is untrue or

22   misleading, and which is known, or which by the exercise of reasonable care should be known, to be

23   untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to

24   be so made or disseminated any such statement as part of a plan or scheme with the intent not to

25   sell that personal property or those services, professional or otherwise, so advertised at the price

26   stated therein, or as so advertised."  Cal. Bus. & Prof. Code § 17500.

27       153.    Defendant's ROK game violates the FAL through their false and misleading in-game

28

advertisements that solicit players to pay money to play in Defendant's loot box games, including, but not limited to: The Wheel of Fortune (virtual roulette wheel), The Garden of Infinity (virtual dice), and other in-game chests (loot boxes) which do not disclose the odds of winning specific prizes to players.

154.    Defendant advertises the most desirable items which can be obtained in these games, but does not disclose that odds of actually winning those items is miniscule.

155.    Defendant's advertisements for their loot box games are, at best, misleading in that the games are not truly random, but instead manipulated by Defendant to maximize profitability.

156.    Plaintiff and the Class invested in ROK based on these false and misleading loot box game advertisements.

157.    Defendant also advertises ROK as a game for individual players, not shared accounts. In fact, as stated above, Defendant's TOS inform players that account sharing is prohibited.

158.    Based on Defendant's representations that account sharing will not be tolerated, Plaintiff and the Class invested in ROK.

159.    Defendant's representations that account sharing would not be tolerated were not only false and misleading, but Defendant also sought to further capitalize on their misrepresentations by advertising bundles to mitigate losses of in-game virtual items to those players effected by cheating.

160.    Plaintiff and the Class seek to recover all ill-gotten gains from Defendant in addition to all applicable fines, as provided by Cal. Bus. & Prof. Code § 17500.

161.    Plaintiff and the Class also seek an order from the Court enjoining Defendant from any further false or misleading advertisements.

**FOURTH CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**On Behalf of Plaintiff and the Class**

162.    Plaintiff incorporates all other paragraphs as though fully set forth herein.

163.    Every contract is governed by the implied covenant of good faith and fair dealing that prevents a contracting party from depriving other contracting parties from the expended benefits accruing under the contract.

164.    Plaintiff and the Class purchased gems with their real world money in order to

27

1  participate in Defendant's unlawful loot box games based on the deceptive advertisements and
2  misrepresentations discussed herein.

3      165.    Defendant generated enormous profits from Plaintiff and the Class's investments in
4  Defendant's ROK mobile videogame.

5      166.    Defendant failed to reasonably police its game to prevent individuals from cheating,
6  banning cheater, or taking other steps to ensure Plaintiff and other Class Members to receive the
7  benefit of their bargain, a gaming experience.

8      167.    Similarly, Defendant misrepresents the odds of receiving in-game items through its
9  various loot-box systems.

10     168.    These actions prevent Plaintiff and the Class from receive the gaming experience
11  promised by Defendant.

12     169.    It would be unjust to permit Defendant to enrich itself at the expense of Plaintiff and
13  the Class, and Defendant should be required to disgorge this unjust enrichment.

14                          **PRAYER FOR RELIEF**

15     Plaintiff, on behalf of himself and the nationwide Class Members pray for relief as follows:

16         A.  Certifying that this action may proceed as a class action under Rule 23;

17         B.  Declaring that Defendant violated the provisions of the California Consumer
18             Remedies Act, Cal. Civ. Code §§ 1750, *et. seq.*, as discussed herein;

19         C.  Declaring that Defendant violated the provisions of the California Business and
20             Professions Code, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as discussed herein;

21         D.  Declaring that Defendant violated the provisions of the California False Advertising
22             Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, as discussed herein;

23         E.  Declaring that Defendant breach its contractual obligation of good faith and fair
24             dealing;

25         F.  Preliminary, permanent, mandatory injunctive relief prohibiting Defendant, its
26             officers, agents, and all those acting in concert with it, from committing in the future
27             those violations of law herein alleged;

28         G.  Awarding damages, liquidated damages, restitution, and/or statutory and civil

1    penalties and interest thereon as allowed by law to be paid by Defendant for the causes

2    of action alleged herein;

3    H.  Awarding costs and expenses, including reasonable attorneys' fees and expert fees, as

4    permitted by the law;

5    I.  An order appointing Plaintiff, Keith Coy, as class representative for the Class;

6    J.  Awarding class representative service payments to Plaintiff and all other class

7    representatives for their service to the Class and the public; and

8    K.  Ordering such other and further legal and equitable relief the Court deems just,

9    necessary and proper.

10   ///

11   ///

12   **JURY TRIAL**

13   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself

14   and all others similarly situated, respectfully demand a trial by jury.

15   SOMMERS SCHWARTZ, P.C.

16   DATED:  December 17, 2019        By: /s/ Trenton R. Kashima_____
         Trenton R. Kashima, Esq. (SBN 291405)
17       402 West Broadway, Suite 1760
         San Diego, CA 92101
18       Telephone: 248-355-0300
         Facsimile: 248-746-4001
19       Email: tkashima@sommerspc.com

20

21       Kevin J. Stoops (*pro hac vice* forthcoming)
         Charles R. Ash, IV (*pro hac vice* forthcoming)
22       SOMMERS SCHWARTZ, P.C.
         One Towne Square, 17th Floor
23       Southfield, Michigan 48076
         Telephone: 248-355-0300
24       Facsimile: 248-746-4001
         Email: kstoops@sommerspc.com
25       Email: crash@sommerspc.com

26

27       *Attorneys for Plaintiff and Proposed Collective and*
         *Class members*

28

29

## DECLARTION OF TRENTON R. KASHIMA

I, Trenton R. Kashima, declare as follows:

1.      I am an attorney duly licensed and entitled to practice law in the state of California. I am an attorney of the law firm Sommers Schwartz, attorneys for Plaintiff Keith Coy in above-captioned action. I have personal knowledge of the facts stated herein, and if called to do so, could and would competently testify thereto.

2.      Defendant Lilith Games (Shanghai) Co., Ltd. and Shanghai Lilith Network Technology Co., Ltd.'s TOS agreement with Plaintiff and members of the Class expressly provides that any action stemming from a transaction between Defendants and a customer shall be governed by the laws of the State of California and that any legal action shall be filed in the State of California, City and County of San Francisco.  Additionally, Defendants do business in the City and County of San Francisco.

3.      Accordingly, pursuant to California Code of Civil Procedure, section 1780, San Francisco County is the proper venue for Plaintiff's California Consumer Legal Remedies Act claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 17, 2019 in San Diego, California.

/s/ Trenton R. Kashima
Trenton R. Kashima

CLASS ACTION COMPLAINT